Filed 1/26/24  In re Tibbs on Habeas Corpus CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re TODD J. TIBBS<br><br>on<br><br>Habeas Corpus. | D081082<br><br>(San Bernardino<br>Super. Ct. No. WHCJS1900104) |

ORIGINAL PROCEEDING on petition for writ of habeas corpus. Petition denied.

Cuauhtémoc Ortega, Federal Public Defender, John S. Crouchley and Lauren Collins, Deputy Federal Public Defenders, for Petitioner Todd J. Tibbs.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel B. Rogers and Christopher P. Beesley, Deputy Attorneys General, for Respondent California Department of Corrections and Rehabilitation.

I

INTRODUCTION

In 2009, a San Bernardino jury found petitioner Todd J. Tibbs guilty of the premeditated attempted murder of Sequwan Lawrence (Pen. Code,

§§ 187, subd. (a), 664) after the two young men got into a street brawl.[1] At Tibbs's trial, certain witnesses testified that Tibbs shot a firearm at Lawrence during the fight, but missed his intended target.

In 2019, Tibbs filed an original petition for writ of habeas corpus in the California Supreme Court seeking vacatur of his attempted murder conviction. He argued the trial witnesses provided false evidence against him insofar as they testified that he shot a firearm at Lawrence, new evidence (including a recantation from Lawrence) proved he never shot a firearm at Lawrence, and his trial counsel was ineffective for failing to investigate and procure exculpatory evidence establishing that he never shot a firearm at Lawrence. The Supreme Court issued an order to show cause returnable in this court.

The parties disputed several key factual allegations in Tibbs's habeas petition, so we ordered the appointment of a discovery referee to resolve these disagreements. After a two-day evidentiary hearing, the referee issued a report resolving all of the disputed factual issues against Tibbs. The referee found that false evidence bearing on Tibbs's guilt was not admitted at trial, Tibbs did not present credible new evidence that would have more likely than not changed the outcome of the case, and Tibbs's trial counsel was not constitutionally ineffective. We give great weight to the referee's well-supported findings, and deny the petition for writ of habeas corpus.

---

[1]     Further undesignated statutory references are to the Penal Code.

II

BACKGROUND[2]

In 2007, Tibbs was a member of the 18th Street Maze gang who went by the gang moniker, "Mookie." Tibbs was 18 years old and he was dating Lawrence's 14-year-old sister, which caused friction between Lawrence and Tibbs. This hostility angered Lawrence's sister, who threatened to have her boyfriend, Tibbs, beat up her brother, Lawrence. According to Lawrence, Tibbs also confronted him with a firearm two weeks before the incident giving rise to Tibbs's attempted murder conviction, though the details of that confrontation are not apparent from the record before us.

The simmering animosity between Tibbs and Lawrence came to a head on September 7, 2007. That evening, Tibbs and his 16-year-old associate, Brandon Parks-Burns, got into a confrontation with Lawrence and his cohorts in the street in front of Lawrence's home.[3] During the confrontation, Tibbs allegedly shot a firearm at Lawrence, but missed him. Based on this incident, Tibbs and Parks-Burns were charged with the premeditated attempted murder of Lawrence.

A. *Trial Evidence*

At trial, there was no dispute a confrontation took place between Tibbs and Parks-Burns, on the one hand, and Lawrence and his companions, on the

---

[2]     The first two subparts of this section are summarized from *People v. Parks-Burns* (Jan. 11, 2013, D059348) [nonpub. opn.] (hereafter, *Tibbs I*) and *In re Tibbs* (Nov. 3, 2015, D067841) [nonpub. opn.] (hereafter, *Tibbs II*), as well as the reporter's transcripts from Tibbs's attempted murder trial.

[3]     At the evidentiary hearing, Parks-Burns stated his surname was Burns. We will use the surname Parks-Burns in this opinion to maintain consistency with our prior opinions and orders concerning the attempted murder of Lawrence. No disrespect is intended.

other hand. However, there was a dispute as to whether Tibbs fired a gun during the incident—the prosecution argued he fired a gun, while Tibbs posited that he did not. The prosecution relied exclusively on witness accounts from three individuals to present its version of events—Lawrence, Lawrence's girlfriend, and one of Tibbs's former friends.

1. *Lawrence*

Lawrence presented as a relatively reluctant trial witness. He testified he was sitting in his girlfriend's car in front of his house on the night of September 7, 2007. He was accompanied by his girlfriend, as well as his brother and his cousin, who either stood next to the car or leaned against it. Tibbs and Parks-Burns approached the group and pushed his brother and cousin against the car. According to Lawrence, he exited the car and saw Parks-Burns hold a gun to his cousin's face from a distance of about two feet. "Some things were said," and Parks-Burns pointed the gun at Lawrence's face. Lawrence grabbed for the gun and it fell to the ground. Lawrence held onto Parks-Burns, heard a gunshot, and turned to see Tibbs pointing the gun at him. Lawrence restrained Parks-Burns in a headlock and hid behind him to avoid being shot by Tibbs. Tibbs and Parks-Burns retreated without further incident to a nearby home where a friend named Biggie lived.

A police officer interviewed Lawrence that night and relayed the interview to the jury at trial. According to the officer, Lawrence said he was outside talking with his girlfriend, his cousin, and a friend when the incident occurred. Tibbs and Parks-Burns passed Lawrence and his companions at least twice before confronting them. At some point, Tibbs or Parks-Burns yelled, "I got you," at him. Parks-Burns then pointed a gun at Lawrence's head and said, "[Y]ou're going to get killed now." Lawrence grabbed Parks-

4

Burns's hand, causing the gun to fall.  Lawrence heard a gunshot, saw Tibbs pointing a gun at him, and heard Tibbs shout, "18th Street."

2. *Lawrence's Girlfriend*

Lawrence's girlfriend testified at trial, but she was an uncooperative or forgetful prosecution witness who claimed to have little or no memory of the attempted murder.  She testified she was present for the dispute, but she did not remember much about it, including whether anyone used a gun.

However, Lawrence's girlfriend provided a detailed account of the incident to police on the night it occurred.  The interviewing officer relayed his interview with Lawrence's girlfriend to the jury.  During the interview, Lawrence's girlfriend said she was seated in her vehicle and she was together with Lawrence, his brother, and his cousin.  Tibbs and Parks-Burns walked down the street and passed them, but then turned around.  Parks-Burns produced a gun, asked "where they're all from," and pointed the gun at Lawrence's cousin.  Tibbs then told Parks-Burns to shoot Lawrence first, at which point Parks-Burns and Lawrence got into a "tussle," and the gun fell. Lawrence's brother kicked the gun away, but Tibbs picked it up, pointed it at Lawrence, and fired one round.  Lawrence's girlfriend exited her car, ran into Lawrence's house, and called 911.

3. *Tibbs's Former Friend*

One of Tibbs's former friends testified about Tibbs's alleged use of a firearm, though he was not a percipient witness to the incident.  The friend testified that Tibbs tried to sell him a black pistol in August 2007, about a month before the brawl with Lawrence.  Tibbs told him the gun was "hot," meaning it "had bodies on it," and Tibbs said he personally "put a body on it."

The friend spoke with Tibbs again after his fight with Lawrence. During that discussion, Tibbs said he used the gun *after* he had tried to sell it

to the friend. According to the friend, Tibbs said he tried shooting someone with the gun, he missed his target, and he ran to another friend's house to hide after the shooting.

### 4. *Physical Evidence*

The police did not recover a gun or expended shell casings from the crime scene. Further, the prosecution did not seek to admit physical or forensic evidence to establish that Tibbs shot a gun at Lawrence, instead relying solely on the testimony of its witnesses to prove that fact.

### 5. *Judgment of Conviction*

After deliberations, the jury found Tibbs guilty of the premeditated attempted murder charge.[4] It found the crime was gang related (§ 186.22, subd. (b)), and Tibbs discharged a firearm during the commission of the crime (§ 12022.53, subd. (c)). The jury deadlocked on an unrelated charge that Tibbs and Parks-Burns murdered someone named Charles Marshall as part of an attack on a rival gang.[5] The court sentenced Tibbs to state prison for a determinate term of 20 years, plus an indeterminate term of 15 years to life.

On direct appeal, this court affirmed Tibbs's judgment of conviction. (*Tibbs I, supra*, D059348.) The California Supreme Court denied review.

### B. *Prior Habeas Petitions*

#### 1. *First and Second Habeas Petitions*

In 2014, Tibbs filed a pro se petition for writ of habeas corpus in the United States District Court, Central District of California, asserting insufficiency of the evidence and instructional error claims (hereafter, the

---

[4] Parks-Burns admitted to assault with a deadly weapon in juvenile court for his involvement in the incident.

[5] Tibbs later pleaded guilty to voluntary manslaughter and a second jury found Parks-Burns guilty of murder in connection with Marshall's death.

6

first habeas petition).  The federal district court appointed the Federal Public Defender as Tibbs's counsel and stayed the proceeding to allow him to seek habeas relief in state court.  (*Tibbs v. Warden* (C.D. Cal. Nov. 19, 2014, No. ED CV 14-834 SJO (MRW)) 2014 U.S. Dist. Lexis 184668, at *1; *Tibbs v. Grounds* (C.D. Cal. Aug. 31, 2015, No. ED CV 14-834 SJO (MRW)) 2015 U.S. Dist. Lexis 116588.)

In 2015, Tibbs filed a petition for writ of habeas corpus in the California Court of Appeal, raising an actual innocence claim and a claim of ineffective assistance of counsel based on his trial counsel's asserted failure to investigate and call a possible defense witness (Lawrence's sister) at trial (hereafter, the second habeas petition).  (*Tibbs II, supra*, D067841.)  He presented two percipient witness declarations that allegedly constituted new evidence of his actual innocence.  (*Ibid.*)  In a typed and signed declaration dated March 18, 2015, Lawrence's sister averred she saw the fight, saw her father come out of their house to break up the fight, and saw Tibbs and Parks-Burns leave the scene afterwards, but she never saw a gun or heard one go off.  (*Ibid.*)  In the second declaration, a handwritten and signed declaration dated March 24, 2015, Parks-Burns said a gun was never drawn during the fight.  (*Ibid.*)

Our court issued an order to show cause, but denied relief in relevant part.  (*Tibbs II, supra*, D067841.)  We reasoned the declaration from Lawrence's sister did not completely undermine the entire structure of the prosecution's case or point unerringly to Tibbs's innocence or reduced culpability—the standard that, at the time, applied to actual innocence claims based on newly-discovered evidence.  (*Ibid.*)  Further, we noted Tibbs effectively conceded the declaration from Lawrence's sister was not new evidence because it was not discovered in a timely manner.  (*Ibid.*)  We also

7

held that Tibbs did not establish ineffective assistance of counsel based on his trial counsel's failure to call Lawrence's sister as a witness because it was not reasonably probable Tibbs would have obtained a more favorable result at trial if she had testified to the facts asserted in her declaration. (*Ibid.*)

We determined the Parks-Burns declaration was not new evidence warranting habeas relief either. (*Tibbs II, supra*, D067841.) We concluded it would merely sharpen a conflict in the trial testimony as to whether Tibbs used a gun, rather than pointing unerringly to Tibbs's actual innocence. (*Ibid.*)

Tibbs filed a petition for review of our decision denying his second habeas petition, which the Supreme Court denied.

In 2017, the federal district court denied the first habeas petition. (*Tibbs v. Grounds* (C.D. Cal. Mar. 14, 2017, No. ED CV 14-834 SJO (MRW)) 2017 U.S. Dist. Lexis 67841; *Tibbs v. Grounds* (C.D. Cal. Apr. 29, 2017, No. ED CV 14-834 SJO (MRW)) 2017 U.S. Dist. Lexis 67739.) The United States Court of Appeals for the Ninth Circuit affirmed the denial order and the United States Supreme Court denied Tibbs's subsequent petition for writ of certiorari. (*Tibbs v. Grounds* (9th Cir. 2019) 768 Fed.Appx. 710.)

2. *Third Habeas Petition*

With permission from the United States Court of Appeals for the Ninth Circuit, Tibbs then filed another habeas petition in the United States District Court, Central District of California (hereafter, the third habeas petition)—a petition that largely mirrors the fourth, fifth, and sixth habeas petitions he would later file in state court, as discussed below. The federal district court stayed the action to permit Tibbs to seek habeas relief in state court.

### 3. *Fourth Habeas Petition (San Bernardino Superior Court)*

On March 1, 2019, Tibbs filed a petition for writ of habeas corpus in the Superior Court for the County of San Bernardino (hereafter, the fourth habeas petition). He claimed he obtained new evidence of his actual innocence in the form of two additional witness declarations—a typed, unsigned, and undated declaration from Lawrence's girlfriend, and a typed and signed declaration, dated November 22, 2017, from a neighbor who said he witnessed the fight. Tibbs also argued his counsel was ineffective for failing to investigate and procure this evidence at trial.

In her unsigned declaration, Lawrence's girlfriend stated Tibbs and an accomplice walked up to Lawrence while he was standing by her car. She said the men "exchanged words and then started fighting," and she went into Lawrence's house to call the police. She stated she did "not recall seeing anyone holding a gun or pointing a gun at anyone during the incident," nor did she recall hearing a gunshot. She said there was "a lot of tussling and wrestling, and then it ended without anyone getting hurt."

The neighbor averred in his declaration that he "was outside in front of [his] house" on the evening of September 7, 2007, "watching as some of [his] nieces and nephews were playing." He said he saw the confrontation from a distance of about 20 feet and he recognized Tibbs, Parks-Burns, and Lawrence as the fight participants. The neighbor stated he never saw anyone with a gun, heard a gunshot, or heard anyone say anything about a gun. He said it "was a short fistfight, which ended before the police arrived."

On April 12, 2019, the court denied the fourth habeas petition, finding it effectively tried to challenge the sufficiency of the evidence supporting the jury's finding that Tibbs discharged a firearm—a claim not cognizable on habeas review. The court also found the proffered declarations were not new

9

evidence. It reasoned the declarations were "untimely," as they were produced nine years after Tibbs's conviction. It found Lawrence's girlfriend's declaration had "little value" because it was unsigned and inconsistent with her statements to police and Lawrence's trial testimony. Finally, the court found it was not reasonably likely the admission of the neighbor's declaration would have produced a different outcome at trial.

The court found Tibbs's ineffective assistance of counsel claim failed as well, as it was not reasonably likely he would have achieved a better outcome at trial but-for his counsel's allegedly deficient performance. The court reasoned that "additional evidence" concerning Tibbs's use of a gun would not have made a different outcome reasonably likely because the topic of his gun use was already the subject of witness examinations at trial and Tibbs's trial counsel had already argued to the jury—unsuccessfully—that no gun was used.

### 4. *Fifth Habeas Petition*

On May 24, 2019, Tibbs filed a petition for writ of habeas corpus with our court (hereafter, the fifth habeas petition), which resembled the fourth petition. He asserted an actual innocence claim based on new evidence, as well as an ineffective assistance of counsel claim.

However, one difference between the fourth and fifth habeas petitions was that Tibbs proffered *three* witness declarations with the fifth petition— the prior declarations from Lawrence's girlfriend and neighbor, plus a typed and signed declaration, dated May 28, 2019, from the victim himself, Lawrence. In Lawrence's four-paragraph declaration, he averred he fought Tibbs and his companion years ago, "but it was just a fight." He recanted his trial testimony and said he never saw a gun and never heard one go off. He stated he did not want to press charges against Tibbs, but felt threatened to

testify by the district attorney and the police.  He also said, "[Tibbs] has done enough prison time for this ...."

On July 17, 2019, our court summarily denied the fifth habeas petition. We reasoned relief was unavailable because Tibbs failed to show that the declarations were presented without substantial delay, or that they were not discoverable through the exercise of due diligence prior to trial.  Further, we determined Tibbs did not show his counsel was ineffective for failing to interview the declarants.  We noted that two of the declarants (Lawrence and his girlfriend) gave inculpatory pretrial statements to police and we reasoned Tibbs's counsel reasonably could have decided not to conduct a further investigation of the declarants based on these pretrial statements.

5. *Sixth Habeas Petition*

On September 16, 2019, Tibbs filed an original petition for writ of habeas corpus in the California Supreme Court (hereafter, the sixth habeas petition), which somewhat paralleled the fifth habeas petition.  Like the fifth habeas petition, the sixth habeas petition asserted a claim of actual innocence, as well as a claim of ineffective assistance of counsel based on counsel's failure to investigate and obtain exculpatory evidence proffered by the three declarants.  However, unlike the actual innocence claim in the fifth habeas petition, the actual innocence claim in the sixth habeas petition was not based exclusively on the discovery of new evidence; rather, it argued false evidence was admitted at Tibbs's trial—specifically, Lawrence's testimony that Tibbs used a gun.

On October 12, 2022, the California Supreme Court ordered the Department of Corrections and Rehabilitation (hereafter, the People) to show cause, returnable in our court, whether the superior court and our court misapplied the standard for establishing a prima facie case for relief when we

11

adjudicated the fourth and fifth habeas corpus petitions, respectively, and whether Tibbs presented new evidence of such decisive force and value that it would have more likely than not changed the outcome at trial.

The People filed a return and Tibbs filed a traverse in which he argued an evidentiary hearing was necessary to resolve disputed issues of fact. We agreed with Tibbs. Therefore, on March 2, 2023, we directed the Presiding Judge of the Superior Court, County of San Bernadino, to appoint a discovery referee to receive evidence, make findings of fact, and submit a report adjudicating various disputed factual issues. The following day, the Presiding Judge appointed Judge Gregory S. Tavill of the Superior Court, County of San Bernardino, to serve as discovery referee.

C. *Evidentiary Hearing*

The referee held an evidentiary hearing on June 26 and 27, 2023. The Federal Public Defender represented Tibbs at the hearing and Tibbs personally attended the hearing, though he did not testify at it. Tibbs subpoenaed Lawrence, but Lawrence failed to appear. Tibbs also tried to subpoena Lawrence's girlfriend, but he was unable to serve her with a subpoena, and she did not attend the hearing either.

1. *Tibbs's Witnesses*

Tibbs called three witnesses at the evidentiary hearing: (1) Lawrence's neighbor, the declarant who averred in his 2017 declaration that the incident was a "short fistfight," nothing more; (2) James Gass, Tibbs's trial counsel;

and (3) Lawrence's sister, who averred in her 2015 declaration that she witnessed the confrontation and never saw a gun or heard a gunshot.[6]

- <u>Lawrence's Neighbor</u>:  Lawrence's next-door neighbor was 16 or 17 years old when the confrontation occurred.  On direct examination, he testified he was standing in his front yard with his little brothers (it was "just us") when he witnessed the fight take place "in front of [his] house."  He said three people were involved—Tibbs, Parks-Burns, and Lawrence.  He testified they were "screaming," "saying bad words," and "wrestling," and the altercation lasted two to five minutes.  He said he did not see a firearm or hear a gunshot.

On cross-examination, the People presented the neighbor with his declaration and directed his attention to his averment that he was standing outside with his "nieces and nephews" during the incident—a statement that was seemingly inconsistent with his testimony that he was standing outside with his little brothers.  In response, the neighbor stated he was "out there with [his] nieces, nephews, and brothers," and they "were all together."

The People also questioned the neighbor whether he was taken into custody on the night of the confrontation.  The neighbor admitted he was arrested and taken to juvenile hall for possession of marijuana or possession of marijuana for sale.  However, he said he did not remember details of the arrest, including whether he was taken into custody at gunpoint, or whether he had 11 bags of marijuana in his possession when he was arrested.  Under

---

6    In our order directing the appointment of a discovery referee, we did not instruct the referee to decide questions pertaining specifically to Lawrence's sister, given that Tibbs's sixth habeas petition referenced her only in passing and her declaration was not included as an attachment to the petition.  Nonetheless, the referee allowed Tibbs to elicit testimony from her, over the objection of the People.

a separate line of questioning, the neighbor admitted he was convicted of receipt of stolen property in 2013.

- **James Gass**: James Gass was a solo practitioner when he represented Tibbs in his attempted murder trial. At the time, Gass had practiced law for 18 years. As part of his normal trial preparation, Gass would review police reports of the incidents from which his clients' charges stemmed. He prepared for Tibbs's trial by reviewing the case file, discussing the incident with Tibbs and the prosecutor, and possibly talking about the case with Tibbs's father and the arresting officers.

On direct examination, Gass testified he did not remember the prosecution's witnesses and he did not think he called defense witnesses. He recalled there were two witnesses ("a couple, a girl and a guy"), one of whom tried to "back out of whatever they told the police." But he could not recall whether he discovered that fact prior to trial or when the witness testified at trial. Gass testified that in cases where he has "reason to believe that one of [the prosecution witnesses is] not going to be cooperative with the prosecution," he did not think "it would make things better to send an investigator to try and confirm whether [she would] change her story or not change her story or cooperate or not cooperate." According to Gass, witnesses are not "likely to talk to a defense investigator," and sending an investigator "may make things worse."

On cross-examination, the People asked Gass whether it is common for the defense to subpoena a victim to testify at trial. He said it was uncommon because "[t]here's very little chance that [the defense would] be better off with the person ... who's already told the police 'that guy shot at me' ...." In short, "there would be a downside, and there would be no upside" to calling a victim as a defense witness. When presented with a hypothetical scenario mirroring

14

the facts of the case, Gass also testified that a 16-year-old witness arrested while in possession of marijuana (i.e., a witness like Lawrence's neighbor) would be unlikely to cooperate with the defense.

Under a separate line of questioning, Gass testified that, at some point, he became aware Parks-Burns had confessed to police that Tibbs fired a handgun during the confrontation and gave the gun to their cohort, Biggie. Further details about Parks-Burns's confession will be discussed shortly.

On redirect, Gass confirmed he did not take measures to find out whether neighborhood residents witnessed or heard the incident and he did not subpoena any such witnesses. Gass also testified he did not recall taking measures to secure the trial attendance of Lawrence's sister or the neighbor who allegedly saw the incident.

- <u>Lawrence's sister</u>: Lawrence's younger sister, who was also Tibbs's former girlfriend, testified she was standing outside three or four houses away when a verbal confrontation started outside her house. She said she was "not sure who all was there," but she saw Tibbs, Lawrence, Lawrence's girlfriend, her father, and neighbors outside. She stated she was called into her house, so she "made [her] way inside," and she "didn't stop to watch or anything." She testified she did not see a gun or hear a gunshot, but she did hear a helicopter.

On cross-examination, Lawrence's sister testified she did not "stop to watch" the fight when she walked inside and she did not see the fight end. She also said she does not currently speak with her brother, Lawrence.

2. *The People's Witnesses*

The People called four witnesses to the stand: (1) Parks-Burns; and three members of the San Bernardino Police Department, (2) Lieutenant Timothy Crocker; (3) Sergeant Devon Reid; and (4) Sergeant Lanier Rogers.

15

- <u>Lieutenant Crocker</u>:  In January 2008, Lieutenant Crocker interviewed Parks-Burns while he was investigating the death of Marshall. During the interview, Parks-Burns confessed to Crocker that Tibbs fired a gun during the incident with Lawrence ("he shot it").  Parks-Burns said the gun was the same gun that was used to perpetrate Marshall's murder. Further, he admitted that "Mookie" (Tibbs) handed the gun off to Biggie, who "hid it or something."  Audio recordings and transcripts of the interview were admitted into evidence at the evidentiary hearing.  As far as we can discern, the recordings and transcripts were not introduced into evidence at trial.

- <u>Parks-Burns</u>:  Parks-Burns testified that Tibbs, Lawrence, Lawrence's girlfriend, and two of Lawrence's relatives were present for the incident.  He said it was "[j]ust a fight," and no gun was shot or used.

The People then sought to impeach Parks-Burns's testimony by questioning him about his custodial interview with Lieutenant Crocker. Parks-Burns said he did not remember telling Crocker that Tibbs shot a gun during the incident.  Parks-Burns denied telling Crocker that Tibbs used the same gun to shoot Marshall or that Tibbs gave the gun to Biggie.

- <u>Sergeant Reid</u>:  Sergeant Reid testified he detained Lawrence's neighbor on the night of September 7, 2007.  Reid stated he detained the neighbor at gunpoint while the neighbor was in possession of 11 individually-packaged bags of marijuana—details the neighbor claimed not to remember when he testified at the evidentiary hearing.

- <u>Sergeant Rogers</u>:  Sergeant Rogers responded to the incident on September 7, 2007, and he located the suspects at a house near the site of the confrontation.  He testified the suspects were an adult (Tibbs) and a juvenile (Parks-Burns).  According to Rogers, the adult suspect said that he and the juvenile suspect were walking in the area when several individuals jumped

the juvenile suspect. The adult suspect stated he heard a gunshot and both suspects ran to their friend's house where they hid until they were detained by police. An incident report prepared by Rogers was admitted into evidence at the hearing.[7] Based on our review of the record, it does not appear the incident report was admitted at trial.

D. *Discovery Referee's Report*

On July 21, 2023, the discovery referee issued a 16-page report setting forth findings on the disputed issues of fact. The referee found: (1) no new evidence was presented that would have more likely than not changed the outcome of trial; (2) Lawrence and his girlfriend did not provide false evidence that was substantially material or probative on the issue of guilt; and (3) Tibbs's trial counsel was not ineffective.

1. *No New Evidence*

The report found that Lawrence's neighbor's testimony was not new evidence. It noted the neighbor could not remember whether more than three persons were involved in the fight, even though it was uncontroverted that at least six persons were present—Tibbs, Parks-Burns, Lawrence, Lawrence's girlfriend, and two of Lawrence's relatives. It observed that the neighbor could not recall whether there were cars parked on the street, but it was

---

[7]     In the incident report, Rogers wrote: "[Tibbs] advised me that he and [Parks-Burns] were confronted by several individuals. He told me the individuals were making aggressive statements and they were insulting him because of the street gang that he belonged to. He advised me that the suspects were possibly members of the Delmann Heights gang and they were calling him a, 'Bitch-ass nigger,' because he was a member of the 18th Street gang. [¶] He told me the individuals then, for unknown reasons, jumped on [Parks-Burns] and started punching him. He advised me that when he observed several more individuals running to join the fight, **he heard a gunshot**. He advised me that he did not know where the gunshot came from or who fired it." (Bolding and italics added.)

uncontroverted Lawrence was in or near his girlfriend's car when the fight occurred. The report identified the discrepancy in the neighbor's testimony that he was outside with his "brothers," and the statement in his declaration that he was outside with his "nieces and nephews." It noted that the neighbor stated—in both his declaration and his testimony—that the altercation occurred across from his house; however, the altercation actually occurred in front of Lawrence's house, which was next door to the neighbor's house. Finally, the report emphasized that the neighbor denied remembering key details about the night, including whether he was arrested at gunpoint or whether he possessed 11 bags of marijuana at the time of his arrest.

Overall, the report found the neighbor's testimony was "inconsistent and incomplete," which raised a "significant doubt regarding the accuracy and truthfulness of his description of the incident in terms of whether a gun was present and whether the gun was fired." It also emphasized that the neighbor "had a few theft related offenses in his criminal history," which suggested a willingness to lie. The report concluded, "It was not totally clear whether [the neighbor's] testimony about the absence of a gun and not hearing a gunshot was the result of [his] being untruthful or simply because he could not remember. Either way, [his] testimony regarding whether a gun was used by [Tibbs] and whether the gun was fired was not believable."

The report found Lawrence's sister's testimony was not new evidence either. It noted that her declaration omitted key facts like the presence of two of her relatives during the confrontation. The report also noted a material discrepancy between Lawrence's sister's declaration and her testimony. In her declaration, she averred she "saw" the fight, "saw" her dad "come out of [their] house to break up the fight," and "saw" Tibbs and Parks-Burns "leave the scene" and "get arrested." But, at the hearing, she said she

18

did not "stop to watch" the confrontation and went inside her house before it ended. The referee found the sister's testimony was "simply not credible."

As part of the analyses just discussed, the report summarized the trial evidence tending to show that Tibbs shot a firearm. It noted that Lawrence's girlfriend called 911, reported a man with a gun, and identified Tibbs as the person who pointed the gun and fired a round at Lawrence. It stated that Lawrence gave a similar account to officers, and "repeated the essential parts of the story" at trial. Further, it described the trial testimony of Tibbs's friend, who said that Tibbs admitted he had tried to shoot at someone with a firearm.

In light of this evidence, and the discrepancies in the testimony given by both the neighbor and Lawrence's sister, the report found, "[T]he claimed new evidence from [the neighbor] and [Lawrence's sister] does not raise any reasonable doubt as to [Tibbs's] guilt for the attempted murder of Sequwan Lawrence. [Citation.] Neither witnesses' [sic] testimony was 'credible, material, [and] presented without substantial delay,' nor was their testimony, individually and collectively, 'of such decisive force and value that it would have more likely than not changed the outcome at trial.' "

2. *No False Evidence*

The discovery referee's report found that Lawrence and his girlfriend did not provide false testimony against Tibbs that was substantially material or probative on the issue of his guilt.

In light of the trial evidence tending to show that a gun was used, the report found "no reason to question the truthfulness of that part of [Lawrence's] testimony inculpating Petitioner Todd Tibbs as the person that shot the gun at Sequwan Lawrence on the night of the incident." Because Lawrence did not testify at the evidentiary hearing, and his declaration was

19

not moved into evidence during the hearing, the report did not elaborate much on Lawrence's declaration. However, the report observed in a footnote that Lawrence did not "explain the discrepancies between his pretrial statements and trial testimony ... as compared to the untimely and delayed declaration ...." In the same footnote, the report found an apparent inconsistency between the overall theme of Lawrence's declaration ("that [Tibbs] had done nothing wrong") and its specific statement that Tibbs had "done enough prison time for this."

As for Lawrence's girlfriend, the report found she was not truthful when she testified at trial that she "did not remember seeing a gun during the incident," but her "lack of recollection and related false testimony" was not substantially material or probative on the issue of guilt.

3. *No Ineffective Assistance of Counsel*

Finally, the report found that Gass, Tibbs's counsel, was not ineffective. It found that Gass did not take measures to ascertain whether Lawrence, Lawrence's girlfriend, or the neighbor would provide material exculpatory testimony for the defense, and he did not take measures to secure those persons' appearance as defense witnesses; however, these acts or omissions did not fall below an objective standard of reasonableness under prevailing professional norms.

The report found "[t]here was no reason for counsel to expect that Sequwan Lawrence would provide any exculpatory testimony favorable to [Tibbs]." It noted that Gass reviewed the police reports before trial, including reports documenting the pretrial statements from Lawrence, Lawrence's girlfriend, and Tibbs's friend—all of which "describ[ed] the same incident involving two perpetrators, a handgun and a gunshot." It noted that Parks-Burns admitted in his custodial interview that Tibbs used a handgun, and

20

Gass was aware of the incriminating admission. It mentioned Tibbs's admission (introduced at the evidentiary hearing, but not trial) that a gunshot was fired during the encounter. Further, it referenced Tibbs's statements to his friend about his use of the firearm that he had tried to sell to the friend. The report concluded, "Given the available, uncontroverted and overwhelming information that Tibbs fired a handgun during the incident, not pursuing additional investigation regarding whether Tibbs fired the handgun was objectively reasonable at the time of counsel's representation."

The report similarly found, "[t]here was no reason to expect [Lawrence's girlfriend] would provide exculpatory testimony. When interviewed by the police following the incident, [she] gave a detailed description of the incident implicating Todd Tibbs in the attempted murder of Sequwan Lawrence." According to the report, she "presented as a reluctant and recanting witness during the trial," but that was "not a surprise given [Tibbs's] membership with the 18th Street Maze gang." The report noted that Gass remembered a witness trying to back out of his or her statements to police. However, Gass "provided a reasonable tactical reason for not re-interviewing a witness such as [Lawrence's girlfriend], stating that to re-interview a reluctant witness may make things worse [for the defense] if the witness changes their story again when they come to court."

Finally, in light of the trial evidence and the evidentiary hearing testimony, the report found that Gass "had no reason to believe there could be any possibility that [Lawrence's neighbor] would truthfully say anything exculpatory regarding the events of September 7, 2007," and he had "no reason to believe that any witnesses existed that would say that the incident did not involve a gun and a gunshot."

E. *Tibbs's Exceptions to the Discovery Referee's Report*

On September 7, 2023, Tibbs filed exceptions to the discovery referee's report and, on October 26, 2023, the People filed a response to Tibbs's exceptions in this court. Broadly speaking, Tibbs grouped his exceptions into two categories: (1) exceptions to the referee's new and false evidence findings; and (2) exceptions to the referee's ineffective assistance of counsel findings.

1. *Exceptions to the New and False Evidence Findings*

Tibbs argued the discovery referee's report should be rejected—across the board—because it devoted insufficient attention to weaknesses in the prosecution's case at trial. Tibbs emphasized that the prosecution relied exclusively on witness testimony to establish his use of a gun, rather than relying on physical or forensic evidence. Tibbs also characterized Lawrence's trial testimony as "meandering and often contradictory," Lawrence's girlfriend's trial testimony as "devoid of facts," and Tibbs's former friend's trial testimony as unbelievable and biased.

Tibbs then presented exceptions to the discovery referee's findings concerning specific witnesses who testified at the evidentiary hearing, starting with Lawrence's neighbor. He faulted the referee for assuming more than three persons were present for the incident—and then criticizing the neighbor for saying only three individuals were there—because the referee purportedly based his assumption solely on the testimony of the prosecution's witnesses. Tibbs also asserted there was no discrepancy between the neighbor's testimony that the incident took place "in front of [his] house," and other witnesses' reports that it took place in front of Lawrence's house. As Tibbs explained, the houses were next door to one another, the properties

22

were "small," and the neighbor placed the incident no more than "one to two car lengths" away from the spot identified by the other witnesses.

Tibbs raised exceptions to the referee's findings about Lawrence's sister as well. He criticized the report for relying on the prosecution's trial witnesses to establish the identities of everyone involved in the confrontation (namely, for assuming Lawrence's sister's male relatives were present) and then faulting Lawrence's sister for failing to identify those relatives in her declaration. Tibbs also argued the referee improperly focused on "nonessential," "largely irrelevant," and "minor differences" between her declaration and her evidentiary hearing testimony.

As noted, Parks-Burns testified at the evidentiary hearing that the confrontation with Lawrence was "[j]ust a fight," and no gun was fired. However, the discovery referee did not discuss Parks-Burns's testimony in the report. In Tibbs's exceptions to the report, Tibbs did not contend that Parks-Burns's hearing testimony constituted new evidence. However, he claimed the referee erred by "fail[ing] to account for [Parks-]Burns's hearing testimony [when] determining the falsity of evidence presented at trial by the prosecution."[8]

Next, Tibbs objected to the referee's brief characterization of Lawrence's declaration, which was not entered into evidence at the evidentiary hearing. Tibbs argued there was no inconsistency between Lawrence's averment that Tibbs never tried to shoot Lawrence and his statement that Tibbs had "done enough prison time for this."

---

[8] By failing to make any argument that Parks-Burns's hearing testimony is new evidence—and focusing strictly on whether his testimony discloses the existence of false evidence—Tibbs appears to impliedly concede that Parks-Burns's hearing testimony is not new evidence.

23

Finally, Tibbs took exception with the report's finding that Lawrence's girlfriend's reluctance to testify at trial was "not a surprise given [Tibbs's] membership with the 18th Street Maze gang." According to Tibbs, "it is at least an equally likely inference that [Lawrence's girlfriend], having been subpoenaed to the courtroom and placed under oath, decided not to repeat a false and potentially perjurious statement that Tibbs brandished and fired a gun."

2. *Exceptions to the Ineffective Assistance of Counsel Findings*

Tibbs presented two exceptions to the discovery referee's findings concerning ineffective assistance of counsel.

First, Tibbs took exception with the referee's finding that Gass did not act unreasonably when he failed to investigate and procure the attendance of certain witnesses at trial to corroborate his non-use of a gun—namely, Lawrence's neighbor and sister. As noted, the referee found Gass "had no reason to believe that any witnesses existed that would say that the incident did not involve a gun and a gunshot." According to Tibbs, that finding was erroneous because there was no physical evidence he used a gun and Gass himself had argued to the jury during closing arguments that Tibbs did not use a gun.

Second, Tibbs objected to the referee's finding he suffered no prejudice from Gass's failure to investigate or call the neighbor and Lawrence's sister as defense witnesses. He argued there was a reasonable probability at least one juror would have voted to acquit him, given the absence of physical evidence of a gunshot and the "wobbly performance of the prosecution's eyewitnesses at trial."

24

III

DISCUSSION

A. *Habeas Corpus Proceedings*

"Our state Constitution guarantees the right to habeas corpus." (*In re Cook* (2019) 7 Cal.5th 439, 452; see Cal. Const., art. I, § 11; *In re Figueroa* (2018) 4 Cal.5th 576, 586 (*Figueroa*) ["A defendant's right to seek habeas corpus relief is enshrined in California's Constitution."].) "The availability of the writ is implemented by section 1473, subdivision (a), which provides: 'A person unlawfully imprisoned or restrained of his or her liberty, under any pretense, may prosecute a writ of habeas corpus to inquire into the cause of his or her imprisonment or restraint.' " (*Cook*, at p. 452.) All courts in California have original jurisdiction in habeas corpus proceedings.[9] (Cal. Const., art. VI, § 10 ["The Supreme Court, courts of appeal, superior courts, and their judges have original jurisdiction in habeas corpus proceedings."].)

"Frequently used to challenge criminal convictions already affirmed on appeal, the writ of habeas corpus permits a person deprived of his or her freedom, such as a prisoner, to bring before a court evidence from outside the trial or appellate record, and often represents a prisoner's last chance to obtain judicial review." (*In re Reno* (2012) 55 Cal.4th 428, 449–450, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner

---

[9] Although all California courts have original habeas corpus jurisdiction, "[a] higher court 'has discretion to deny without prejudice a habeas corpus petition that was not filed first in a proper lower court.' " (*Robinson v. Lewis* (2020) 9 Cal.5th 883, 895.) For that reason, " 'California's habeas rules lead a prisoner ordinarily to file a petition in a lower court first.' " (*Ibid.*)

bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474 (*Duvall*).)

"A habeas corpus proceeding begins with the filing of a verified petition for a writ of habeas corpus. The petition 'must allege unlawful restraint, name the person by whom the petitioner is so restrained, and specify the facts on which [the petitioner] bases his [or her] claim that the restraint is unlawful.' [Citations.] When presented with a petition for a writ of habeas corpus, a court must first determine whether the petition states a prima facie case for relief—that is, whether it states facts that, if true, entitle the petitioner to relief—and also whether the stated claims are for any reason procedurally barred." (*People v. Romero* (1994) 8 Cal.4th 728, 737 (*Romero*).)

"If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]. [Citations.] 'When an order to show cause does issue, it is limited to the claims raised in the petition and the factual bases for those claims alleged in the petition. It directs the respondent to address only those issues.' [Citation.] Issuance of an [order to show cause], therefore, indicates the issuing court's preliminary assessment that the petitioner would be entitled to relief if his factual allegations are proved." (*Duvall, supra*, 9 Cal.4th at p. 475, italics omitted; *In re Serrano* (1995) 10 Cal.4th 447, 455 (*Serrano*) ["it signifies our 'preliminary determination that the petitioner has made a prima facie statement of specific facts which, if established, entitle [petitioner] to habeas corpus relief under existing law' "], italics omitted.)

"As a practical matter, the issuance of the order to show cause creates a 'cause' giving the People a right to reply to the petition by a return and to otherwise participate in the court's decisionmaking process. [Citation.] It is

26

the interplay between the return and the petitioner's response to the return in a pleading called the traverse, that frames the issues the court must decide in order to resolve the case." (*Serrano, supra*, 10 Cal.4th at p. 455.)

Once a court issues an order to show cause, the return becomes the principal pleading in the habeas proceeding and, as such, it "is 'analogous to the complaint in a civil proceeding.' " (*Romero, supra*, 8 Cal.4th at pp. 738–739.) The return must " 'allege *facts* tending to establish the legality of petitioner's detention.' [Citations.] Those facts are not simply the existence of a judgment of conviction and sentence when the petitioner challenges his restraint in prison. The factual allegations of a return must also respond to the allegations of the petition that form the basis of the petitioner's claim that the confinement is unlawful." (*Duvall, supra*, 9 Cal.4th at p. 476; see *Figueroa, supra*, 4 Cal.5th at p. 587 ["The respondent addresses those issues identified in the order to show cause, and must allege facts ' "tending to establish the legality of petitioner's detention." ' "].)

"To respond to the return, the habeas corpus petitioner may either file a traverse or the parties may stipulate that the original habeas corpus petition be treated as a traverse." (*Duvall, supra*, 9 Cal.4th at p. 477.) "The traverse is analogous to the answer in a civil proceeding. [Citation.] Thus, it is through the return and the traverse that the issues are joined in a habeas corpus proceeding." (*Romero, supra*, 8 Cal.4th at p. 739.)

"Once the issues have been joined in this way, the court must determine whether an evidentiary hearing is needed. If the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing. [Citations.] Conversely, consideration of the written return and matters of record may persuade the court that the contentions advanced in the petition lack merit,

27

in which event the court may deny the petition without an evidentiary hearing." (*Romero, supra*, 8 Cal.4th at p. 740; see also *Figueroa, supra*, 4 Cal.5th at p. 587 ["An evidentiary hearing is not required if ' "there are no disputed factual questions as to matters outside the trial record." ' "].)

Alternatively, "if the return and traverse reveal that petitioner's entitlement to relief hinges on the resolution of factual disputes, then the court should order an evidentiary hearing. [Citation.] Because appellate courts are ill-suited to conduct evidentiary hearings, it is customary for appellate courts to appoint a referee to take evidence and make recommendations as to the resolution of disputed factual issues." (*Romero, supra*, 8 Cal.4th at pp. 739–740.) Exhibits attached to the petition, return, or traverse "are subject to admission into evidence in accordance with generally applicable rules of evidence." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 675.)

"At that hearing, by a preponderance of the evidence, the petitioner must establish facts that provide a basis for relief. [Citations.] The main reason for an evidentiary hearing is to have the referee determine the credibility of the testimony given at the hearing." (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333 (*Bacigalupo*).) " ' "[T]he referee is entitled to discredit portions of a witness's testimony while finding the witness credible in other particulars. [Citation.] Thus, the fact that the referee expressly or impliedly disbelieved a witness in some respects, or that portions of a witness's testimony seem unlikely on their face, does not mean that any finding based solely or primarily on the same witness's testimony on other matters is without substantial support." (*In re Masters* (2019) 7 Cal.5th 1054, 1066 (*Masters*).)

"Because the referee observes the demeanor of the witnesses as they testify, we generally defer to the referee's factual findings and 'give great

28

weight' to them when supported by substantial evidence.' " (*Bacigalupo, supra*, 55 Cal.4th at p. 333; see also *Masters, supra*, 7 Cal.5th at p. 1066 [" ' "Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying." ' "].) " ' "On the other hand, any conclusions of law or resolution of mixed questions of fact and law that the referee provides are subject to our independent review." ' " (*Masters*, at p. 1066.)

B. *New Evidence*

Tibbs claims he has presented us with new evidence tending to establish that he did not fire a gun at Lawrence, which raises a reasonable doubt as to his guilt for the attempted murder of Lawrence.

Based on the parties' submissions and our review of the record, we have identified three categories of potential new evidence relevant to Tibbs's claim: (1) the signed declaration of Lawrence and the unsigned declaration of Lawrence's girlfriend, in which both declarants purportedly recanted their inculpatory statements concerning Tibbs's use of a firearm; (2) Lawrence's neighbor's statements that he witnessed the confrontation and did not see a firearm or hear a gunshot; and (3) Lawrence's sister's statements that she observed the start of the confrontation and did not see a firearm or hear a gunshot. As we shall explain, Tibbs has not carried his burden of establishing, by a preponderance of the evidence, that the declarants' recantations or the new eyewitness accounts warrant habeas relief.

1. *Legal Standards*

By statute, new evidence is defined as "evidence that has not previously been presented and heard at trial and has been discovered after trial." (§ 1473, subd. (b)(1)(C)(ii).) Habeas relief is available if the petitioner proves,

29

by a preponderance of the evidence, that "[n]ew evidence exists that is presented without substantial delay, is admissible, and is sufficiently material and credible that it more likely than not would have changed the outcome of the case." (*Id.*, subd. (b)(1)(C)(i).)[10]

A changed case outcome "means a result different from the guilty verdict [Tibbs's] jury returned." (*In re Sagin* (2019) 39 Cal.App.5th 570, 579.) It "does not require an acquittal, but also encompasses a hung jury." (*Ibid.*) Tibbs's burden "is to show it is more likely than not the new ... evidence would have led at least one juror to maintain a reasonable doubt of guilt." (*Ibid.*) "Since the standard requires that we engage in the retrospective analysis of deciding whether the new evidence would have changed the [case] outcome, we consider only the new evidence identified by the petitioner and the trial record. We do not consider other evidence outside the record," including inculpatory evidence offered by the People for the first time at the evidentiary hearing. (*Id.*, at p. 579, fn. 2.)

2. *Recantations from Lawrence and His Girlfriend*

Together with his petition for writ of habeas corpus, Tibbs filed a signed declaration from Lawrence recanting his trial testimony and his

_____

10    At the time the discovery referee issued his report in this case, section 1473 defined "new evidence" as "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (Former § 1473, subd. (b)(3)(B).) The statute also stated that a writ of habeas corpus could be prosecuted when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (Former § 1473, subd. (b)(3)(A).) The Legislature amended these provisions to the currently operative statutory language quoted above when it enacted Senate Bill No. 97 (2023–2024 Reg. Sess.), effective January 1, 2024. Neither party has argued that these recent legislative amendments affect the outcome of the case.

statements to police that Tibbs shot a firearm at him. Tibbs also filed an unsigned and undated declaration from Lawrence's girlfriend in which she stated she did not recall hearing a gunshot or seeing a firearm. " 'It has long been recognized that "the offer of a witness, after trial, to retract his [or her] sworn testimony is to be viewed with suspicion." ' " (*Masters, supra*, 7 Cal.5th at p. 1067.) However, we need not consider the veracity of the witnesses' recantations here because the recantations were never received into evidence at the evidentiary hearing.

"A reference hearing following issuance of an order to show cause is subject to the rules of evidence as codified in the Evidence Code. [Citation.] Under those rules, an out-of-court declaration is hearsay, and unless subject to some exception permitting it to be admitted, should be excluded upon timely and proper objection. [Citation.] A declaration so excluded is not part of the evidentiary record and cannot serve to support the findings of the referee or this court. The same is true, of course, of declarations which are never offered into evidence, such as those in the present case." (*In re Fields* (1990) 51 Cal.3d 1063, 1070 (*Fields*), fns. omitted; *In re Scott* (2003) 29 Cal.4th 783, 824 ["the reason we require habeas corpus petitioners to prove their disputed allegations at an evidentiary hearing, rather than merely decide the merits of the case on declarations, is to obtain credibility determinations"].)

Neither Lawrence nor his girlfriend testified at the evidentiary hearing. Further, no party attempted to move their out-of-court declarations into evidence. Because Lawrence and his girlfriend did not testify at the evidentiary hearing, and their declarations were never received into evidence at the evidentiary hearing, Tibbs has failed to establish, by a preponderance

31

of the evidence, that the supposed recantations of Lawrence and his girlfriend were new evidence for purposes of section 1473, subdivision (b)(1)(C)(ii).[11]

### 3. *Lawrence's Neighbor's Account*

Lawrence's neighbor was 16 or 17 years old when the confrontation occurred. He did not testify at Tibbs's trial, but he executed a declaration, dated November 22, 2017, in which he said he was outside with his "nieces and nephews" when he witnessed a "short fistfight" break out across the street from his house. He denied seeing a gun or hearing a gunshot.

At the evidentiary hearing, Lawrence's neighbor testified he was outside in his yard with his "little brothers" when he witnessed "three people" (Tibbs, Parks-Burns, and Lawrence) wrestle and fight in front of his house. He said no one else spectated or watched the fight—it was "just [them] … [him] and [his] brothers." As he did in his declaration, Lawrence's neighbor denied seeing a handgun or hearing a gunshot.

The discovery referee discredited the neighbor's testimony, calling it "inconsistent," "incomplete," "not believable," and not "credible." In addition to making these credibility findings, the referee found the testimony "would

---

[11]  At oral argument, the People's counsel conceded it would be "fair" for our court to consider the declarations from Lawrence and his girlfriend as possible (albeit unconvincing) new evidence, given that the declarations are part of the record on appeal and were referenced in the discovery referee's report. We are not bound to accept the People's apparent concession, and we do not do so here. (See *People v. Hawkins* (2012) 211 Cal.App.4th 194, 202–203.) Although the declarations are part of the *appellate* record, no party sought to admit them into evidence and the discovery referee did not receive them into evidence; thus, they are not part of the *evidentiary* record and they cannot constitute new evidence for purposes of section 1473, subdivision (b)(1)(C)(ii). (*Fields, supra*, 51 Cal.3d at p. 1070.) Further, the discovery referee did not rely on the declarations in order to resolve the contested issue before it. Rather, the referee simply summarized Lawrence's declaration in a footnote and stated that Lawrence did not testify at the hearing; therefore, he could not explain the statements from his declaration.

not have changed the outcome" if it had been admitted at trial. Because substantial evidence supported these findings, we afford them great weight and conclude the neighbor's testimony does not merit habeas relief.

As the referee documented in his report, the neighbor's testimony was inconsistent in many key respects with the neighbor's own declaration or with certain facts that were undisputed at trial—or both. For instance, the neighbor stated in his declaration that he was outside on the night of the confrontation, "watching as some of [his] nieces and nephews were playing." But he then contradicted this statement at the hearing, where he said he was outside "with [his] little brothers." When confronted with this inconsistency, the neighbor changed his tune once again, stating he was "out there with [his] nieces, nephews, and brothers. ... [They] were all together." The fact the neighbor presented three different versions of events about the persons in his company—including two different versions at the same hearing—lends credence to the referee's "doubts regarding the accuracy and truthfulness of his description of the incident."

The referee also properly discredited the neighbor's testimony because he stated that only three individuals were involved in the fight and there were no other spectators present. At trial, there was never any disagreement that more than three persons were present, either acting as participants or witnesses. At the very least, there was no dispute Lawrence's girlfriend— who called 911 and reported a gunman—was there. In fact, even Tibbs maintains—contrary to the neighbor—that there were other spectators to the incident, including Lawrence's sister.[12] The neighbor's claim that only three

---

[12]    In both her declaration and her testimony at the evidentiary hearing, Lawrence's sister stated that Lawrence's girlfriend was also present for the confrontation.

people were involved in the fight, and that there were no spectators, provided the referee ample basis to discredit the neighbor's testimony.[13]

Further, the discovery referee reasonably distrusted the neighbor's testimony due to his ostensible forgetfulness concerning his own arrest on the night of September 7, 2007. At the hearing, the neighbor professed to forget details about the night one would expect to be seared into one's memory—namely, whether the police arrested him at gunpoint and whether he was in possession of nearly a dozen bags of marijuana at the time of the arrest. After highlighting these claimed lapses in memory, the referee characterized the neighbor's testimony about the night as "incomplete" and "not believable." "The [referee] had the opportunity to view [the neighbor's] demeanor and therefore was in the best position to assess the credibility of [his] claimed nonrecollection." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 78.)

As the discovery referee noted, the neighbor's credibility was further called into question by evidence that he "had a few theft related offenses in his criminal history," including an admission that he suffered a conviction for receipt of stolen property. Receipt of stolen property is a crime of moral turpitude, as one who "unlawfully acts in disregard for the property rights of others, whether known or unknown, demonstrates moral laxity and to some degree a 'readiness to do evil.' " (*People v. Rodriguez* (1986) 177 Cal.App.3d 174, 179.) "[A]ny criminal act or other misconduct involving moral turpitude suggests a willingness to lie ...." (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24; see also *People v. Hall* (2018) 23 Cal.App.5th 576, 589

13    In Tibbs's exceptions to the discovery referee's report, he objected to the referee's finding of a discrepancy between the neighbor's description of where the confrontation occurred (in front of the neighbor's house) and other witnesses' accounts of where it took place (in front of Lawrence's house). We agree with Tibbs this discrepancy is minimal, given the close physical proximity between Lawrence's house and the neighbor's house.

["misconduct involving moral turpitude may suggest a willingness to lie, which is relevant to the credibility of a witness or hearsay declarant"].)

In light of the discrepancies noted above, the neighbor's stated inability to remember details about the night, and the neighbor's history of engaging in conduct involving moral turpitude, we agree with the referee's determination that the neighbor's testimony about Tibbs's non-use of a gun was not "believable" or "credible." On this basis, the referee properly concluded the neighbor's version of events, as recounted in his declaration and testimony, did not warrant relief. (§ 1473, subd. (b)(1)(C)(i) [new evidence must be "sufficiently material and credible"].)

Moreover, the discovery referee found the neighbor's statements about the presence of a gun were not " 'of such decisive force and value that [they] would have more likely than not changed the outcome at trial,' " in view of the other evidence that was admitted at trial. To be sure, the evidence of Tibbs's guilt was not overwhelming or unassailable, as the prosecution did not introduce physical or forensic evidence establishing the fact that a gun was fired. However, the prosecution's attempted murder case was also not a mere "sideshow" to the remainder of the overall trial—namely, the charges pertaining to the murder of Charles Marshall—as Tibbs now claims.

" '[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) At trial, the prosecution cleared that bar by a healthy margin. It proved Tibbs's use of a gun by relying on accounts from two eyewitnesses and a third witness who said that Tibbs made incriminating admissions to him after the incident with Lawrence.

As discussed, Lawrence's girlfriend called 911 the night of the incident, reported a man with a gun, and said four people were involved in the confrontation—Tibbs, Parks-Burns, Lawrence, and Lawrence's cousin. She said Parks-Burns pointed a gun at Lawrence's cousin, Tibbs told Parks-Burns to shoot Lawrence first, and a physical altercation ensued. According to Lawrence's girlfriend, Parks-Burns dropped the gun and Tibbs picked it up and fired a single shot at Lawrence. Although Lawrence's girlfriend claimed to forget much about the incident at trial, her pretrial report of the incident was admitted into evidence through the testimony of an investigating officer.

Lawrence provided the police with a similar account of the incident. As with Lawrence's girlfriend, an investigating officer relayed Lawrence's account of events to the jury at trial. But, unlike Lawrence's girlfriend, Lawrence also testified at trial that Tibbs fired a gun.

Finally, the jury heard evidence from a third witness—Tibbs's former friend—that Tibbs made incriminating admissions to him shortly after the confrontation with Lawrence. According to the friend, Tibbs told him that he had shot a firearm at someone else, missed his target, and ran to a friend's house to hide afterwards. That admission corroborates the story Lawrence told the jury at trial and the reports both Lawrence and his girlfriend made to police on the night of the incident.

Given the totality of the trial evidence, we conclude that Tibbs has not established, by a preponderance of the evidence, that the neighbor's testimony concerning Tibbs's use or non-use of a firearm—testimony the referee properly deemed "not believable" or "credible"—"more likely than not would have changed the outcome of the case." (§ 1473, subd. (b)(1)(C)(i).)

36

4. *Lawrence's Sister's Account*

Lawrence's younger sister dated Tibbs and was 14 years old at the time of the incident. She did not testify at Tibbs's trial. However, she submitted a declaration, dated March 18, 2015, for one of Tibbs's habeas petitions. She averred she was outside on the night of September 7, 2007, when she "saw [Tibbs] and [Parks-Burns] walk up the street towards the direction of [her] house." She stated Lawrence and his girlfriend were outside and she "saw" Tibbs and Parks-Burns get into an argument with Lawrence. She said she saw her father come out of the house to break up the fight, she saw Tibbs and Parks-Burns leave the scene, and she saw them get arrested down the street, but she "never heard a gun go off" and "never saw a gun."

At the evidentiary hearing, Lawrence's sister testified she was outside three or four houses away when a confrontation unfurled in front of her house. She said she "was not sure who was all there," but she saw Tibbs, Lawrence, Lawrence's girlfriend, her father, and her neighbors outside. She testified she was called into her house, so she "made [her] way inside," and "didn't stop to watch or anything." She stated she did not see a gun or hear a gunshot, but again she acknowledged she did not "stop to watch" the fight and she did not see the fight end.

The discovery referee found Lawrence's sister's testimony about the presence of a gun was "simply not credible." Although she professed in her declaration that she saw the fight, saw her father break up the fight, and saw Tibbs and Parks-Burns leave the scene and get arrested, the referee found she "could not have observed what was described in her declaration because [at the evidentiary hearing, she testified] she did not 'stop to watch or anything' and had gone inside."

37

Tibbs contends these discrepancies and credibility flaws are "minor." We disagree. As Lawrence's sister acknowledged at the evidentiary hearing, she did not know everyone who was present during the fight, she did not stop to watch the fight, and she never viewed the end of the fight because she had gone inside while the fight was ongoing. Undoubtedly, these admissions establish she had a limited ability to perceive whether a gun was in fact used during the confrontation. But they do more than that. They also undercut the witness' credibility, given her unambiguous statements in her declaration that she *did* see the fight, including the end of the fight and Tibbs's flight and arrest. For these reasons, we accept the referee's determination that the sister's claims regarding Tibbs's non-use of a gun were "not credible." Because they were "not credible," they did not warrant habeas relief. (§ 1473, subd. (b)(1)(C)(i) [new evidence must be "sufficiently material and credible"].)

Moreover, the referee found the admission of the sister's testimony was not "of such decisive force and value that it would have more likely than not changed the outcome at trial." (Former § 1473, subd. (b)(3)(A).) As the referee noted, Lawrence's sister would "be subject to cross-examination [at trial] about her allegiances to Tibbs, her boyfriend who was a gang member, and who she had threatened would harm her brother," with whom she was not on speaking terms. We agree with this assessment. Further, in light of the trial evidence tending to establish the fact that Tibbs fired a gun, the material discrepancies between the sister's declaration and her testimony, and the fact the sister was not present for the full confrontation, the referee properly found that Tibbs has not carried his burden of proving that the

38

sister's testimony would have more likely than not changed the outcome of the case.[14]

## C. *False Evidence*

Tibbs also claims false evidence was admitted against him at his attempted murder trial. We deny habeas relief on this claim as well.

### 1. *Legal Standards*

A writ of habeas corpus may be prosecuted when "[f]alse evidence that is material on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to the person's incarceration." (§ 1473, subd. (b)(1)(A).)[15] To obtain habeas relief based on the admission of false evidence, the petitioner must "prove, by a preponderance of the evidence [citation], that (1) '[f]alse evidence' was introduced against him or her at trial, and (2) that the false evidence was ... material ... on the issue' of his or her guilt." (*In re Parks* (2021) 67 Cal.App.5th 418, 444.)

" 'Materiality is shown if there is a reasonable probability the result would have been different without the false evidence.' [Citation.] 'This

---

[14] Because we accept the discovery referee's finding that the testimony provided by the neighbor and Lawrence's sister was not "credible," and neither person's testimony would likely have changed the outcome of the case, we need not address the referee's alternative finding that habeas should be denied because neither person's testimony was "presented without substantial delay." (Former § 1473, subd. (b)(3)(A).)

[15] When the discovery referee issued his report, section 1473 stated that habeas relief could be prosecuted when "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to the person's incarceration." (Former § 1473, subd. (b)(1).) The Legislature amended this provision to the currently operative statutory language when it passed Senate Bill No. 97. Once more, the parties have not argued that these amendments alter the outcome of the present case.

required showing of prejudice is the same as the reasonably probable test for state law error established under *People v. Watson* (1956) 46 Cal.2d 818, 836. [Citation.] We make such a determination based on the totality of the relevant circumstances.' " (*Masters, supra*, 7 Cal.5th at p. 1078.) "Any allegation that the prosecution knew or should have known of the false nature of the evidence is immaterial to the prosecution of a writ of habeas corpus" based on the admission of false evidence. (§ 1473, subd. (b)(3).)

    2. *Lawrence's Account*

As discussed, Lawrence testified as a prosecution witness at Tibbs's trial. Although he presented as a reluctant witness, he conveyed to the jury the essential facts underlying the prosecution's theory of the case—that Parks-Burns pointed a gun at Lawrence's face, Lawrence grabbed for the gun and caused it to fall to the ground, and Lawrence heard a gunshot, turned around, and saw Tibbs pointing a gun at him.

The discovery referee found Lawrence's trial testimony was not false evidence. In particular, the referee found there was "no reason to question the truthfulness of that part of his testimony inculpating Petitioner Todd Tibbs as the person that shot the gun" at him. We accept the referee's well-supported findings.

As the discovery referee noted in his report, Lawrence's trial testimony was consistent with the 911 call Lawrence's girlfriend made and the pretrial reports Lawrence and his girlfriend both provided to law enforcement on the night of the confrontation. In those reports, both witnesses unequivocally asserted that Tibbs fired a gun at Lawrence. Lawrence's testimony was also consistent with the testimony of Tibbs's former friend, who stated that Tibbs told him that he had shot a firearm at someone, missed his target, and fled to a friend's house afterwards. No evidence from Lawrence, his girlfriend, or

40

Tibbs's former friend was admitted at the evidentiary hearing—either in the form of live testimony or declaration evidence—recanting or otherwise undermining Lawrence's trial testimony. We acknowledge the lack of physical evidence supporting the prosecution's position was an exculpatory factor that aided the defense at trial. However, the multitude of witness reports concerning Tibbs's use of a gun strongly supports the referee's finding that the prosecution did not elicit false evidence from Lawrence at trial.

The discovery referee also noted, and we agree, that the veracity of Lawrence's trial testimony was bolstered by the fact that it was in many respects consistent with admissions made by the defendants themselves. As noted in the incident report prepared by Sergeant Rogers, Tibbs told police that "he heard a gunshot" during the confrontation. Although Tibbs did not admit that he personally aimed and fired a gun, his statement lends support to the notion that a gun was in fact used, and it strongly undercuts his subsequent denial that a gun was fired during the incident.

Parks-Burns testified at the evidentiary hearing that the confrontation was "[j]ust a fight," and no gun was shot or used. But he said otherwise in his custodial interview with Lieutenant Crocker. During that interview, Parks-Burns unequivocally stated a gun was fired during the incident and Tibbs was the shooter. According to the transcripts from that interview, Parks-Burns said Tibbs "shot it" (referring to the firearm), and then he "gave it to Biggie." Notably, Parks-Burns made this statement *after* admitting he committed the crime of assault with a deadly weapon for his role in the incident, at which point he presumably had less of an incentive to fabricate facts or implicate Tibbs in hopes of achieving a more lenient disposition.

41

This, in turn, lends credibility to Parks-Burns's admission and Lawrence's trial testimony that Tibbs fired a gun.[16]

For all of these reasons, we adopt the referee's well-supported finding that Lawrence did not provide false evidence bearing on Tibbs's guilt.

### 3. *Lawrence's Girlfriend's Account*

At trial, Lawrence's girlfriend testified she did not remember the specifics of the confrontation, including whether anyone used a gun. The discovery referee found there were "reasons to conclude" this testimony was "not truthful." However, the referee found her lack of recollection and related false testimony was not substantially material on the issue of guilt.

Tibbs does not make an exception directed specifically to this particular finding. Given that Lawrence's girlfriend merely professed a lack of memory about the incident—as opposed to definitively and falsely stating that Tibbs did or did not fire a gun—we accept the referee's finding that the testimony was not material on the issue of Tibbs's guilt.

### D. *Ineffective Assistance of Counsel*

Tibbs' final claim for relief is that his trial counsel, James Gass, was constitutionally ineffective for failing to investigate and procure the trial attendance of eyewitnesses who could testify that he did not fire a gun at Lawrence. For many of the same reasons previously discussed, we deny Tibbs's claim of ineffective assistance of counsel.

---

16      Tibbs objected to the referee's findings concerning Lawrence's testimony on grounds that his testimony was inconsistent with the testimony that Lawrence's neighbor and sister provided at the evidentiary hearing. But, as we previously discussed, there was substantial evidence to support the referee's determination that the neighbor's testimony "was not believable, and [that Lawrence's sister's] testimony was not credible."

1. *Legal Standards*

"The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the ' "right to the effective assistance of counsel at trial." ' [Citations.] 'The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result.' " (*In re Long* (2020) 10 Cal.5th 764, 773 (*Long*).) "[C]laims of ineffective assistance of counsel 'are ordinarily best raised and reviewed on habeas corpus" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051), which "allows for consideration of matters outside the appellate record, including evaluation of counsel's decisions and tactics.' " (*In re A.R.* (2021) 11 Cal.5th 234, 254.)

To succeed on a claim of ineffective assistance of counsel, the petitioner must prove that his or her counsel's actions or omissions " 'fell below an objective standard of reasonableness' [citations] in light of 'the professional norms prevailing when the representation took place' [citation]. [The petitioner] must also show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Long, supra*, 10 Cal.5th at p. 773.)

" '[T]he standard for judging counsel's representation is a most deferential one.' [Citation.] We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' [Citation.] 'Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.' [Citation.] Accordingly, we must 'reconstruct the circumstances of counsel's challenged conduct, and

... evaluate the conduct from counsel's perspective at the time.' " (*Long, supra,* 10 Cal.5th at pp. 773–774; see also *In re Tellez* (2022) 84 Cal.App.5th 292, 303 [" 'a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct*' "].)

" '[T]he petitioner must establish "prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." ' " (*In re Cox* (2003) 30 Cal.4th 974, 1016.) "Prejudice is established if there is a reasonable probability that a more favorable outcome would have resulted had the evidence been presented, i.e., a probability sufficient to undermine confidence in the outcome. [Citations.] The incompetence must have resulted in a fundamentally unfair proceeding or an unreliable verdict.' " (*Ibid.*) " 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982; *People v. Cuevas* (2001) 89 Cal.App.4th 689, 696 ["When [the petitioner] is unable to establish prejudice, a claim of ineffective assistance of counsel fails, and we need not determine whether the complained of conduct was deficient."].)

2. *Failure to Investigate Lawrence and His Girlfriend*

One aspect of Tibbs's ineffective assistance of claim is that his counsel, Gass, did not conduct pretrial interviews of Lawrence or his girlfriend to determine whether they would testify that Tibbs never shot a gun at Lawrence. The discovery referee found Gass did not take steps to ascertain whether Lawrence or his girlfriend would provide exculpatory testimony, nor did he try to secure their attendance at trial as defense witnesses. However, the referee found Gass's omissions did not fall below an objective standard of

44

reasonableness because "[t]here was no reason for counsel to expect that Sequwan Lawrence [or his girlfriend] would provide any exculpatory testimony favorable to [Tibbs]." Tibbs did not raise exceptions to these findings. We accept the referee's findings that Gass's failure to interview Lawrence and his girlfriend was not unreasonable.

As previously discussed, Lawrence told law enforcement prior to trial that Tibbs shot a firearm at him. He told police that Tibbs and Parks-Burns passed by him and his companions at least twice, confronted them, and then yelled, "I got you." He said Parks-Burns pointed a gun at Lawrence's head and stated, "[Y]ou're going to get killed now." During the ensuing scuffle, Parks-Burns dropped the gun and Lawrence heard a gunshot, saw Tibbs pointing a gun at him, and heard Tibbs shout his gang's name, "18th Street."

Lawrence's girlfriend made similar pretrial statements that Tibbs shot a firearm at Lawrence. First, on the night of the incident, she called 911 and reported there was a black male who was "armed with a gun," and he "ha[d] the gun to her boyfriend's head." Then, after police arrived on the scene, she gave a witness statement to a responding officer. She said she was seated in the driver's seat of her vehicle outside Lawrence's house, together with Lawrence, his brother, and his cousin. She stated Tibbs and Parks-Burns walked down the street, continued past them, and turned around, at which point she saw Parks-Burns holding a handgun. According to Lawrence's girlfriend, Parks-Burns pointed the gun at Lawrence's cousin's head and asked, "Where are you all from?" Thereafter, Tibbs told Parks-Burns to shoot Lawrence, a "tussle" ensued causing Parks-Burns to drop the gun, and Tibbs picked up the gun and fired one round at Lawrence. A copy of the police reports documenting these statements was included in Gass's file, which he reviewed as part of his preparation for trial.

45

Further, numerous other witnesses made pretrial statements indicating that Tibbs—or, at minimum, *someone* involved in the incident—shot a firearm. In his custodial interview with Lieutenant Crocker, Parks-Burns stated that Tibbs shot a firearm and "gave it to Biggie" afterwards. Tibbs's former friend told Lieutenant Crocker that Tibbs confessed to him that he had shot at someone, he regretted missing his target, and he went to Biggie's house after the shooting, at which point Biggie took possession of the gun and hid it. Even Tibbs himself told an officer that "he heard a gunshot" during the incident. All of these statements were memorialized in police reports that were included within Gass's trial file.

In light of the pretrial statements that Lawrence and his girlfriend made to law enforcement, we agree with the discovery referee that Tibbs's counsel had no reason to know or suspect they might provide exculpatory testimony supporting Tibbs. Both Lawrence and his girlfriend unambiguously stated Tibbs shot a firearm at Lawrence, and Lawrence's girlfriend even made such statements twice (both in her initial 911 call and while providing a witness report). As noted, there was substantial evidence from other witnesses—including Tibbs, Parks-Burns, and Tibbs's former friend—supporting the notion a shot was fired during the incident.

Because Gass had no reason to know or suspect that Lawrence and his girlfriend would recant their inculpatory pretrial statements, we conclude Gass was not ineffective for failing to interview Lawrence or his girlfriend, or for failing to investigate them as possible defense witnesses. (See *People v. Breslin* (2012) 205 Cal.App.4th 1409, 1419–1420 [counsel was not ineffective for failing to interview crime victim because "there was no indication that the victim was going to recant his statement" to law enforcement inculpating defendant]; see also *People v. Venegas* (1994) 25 Cal.App.4th 1731, 1740–1741

46

[counsel was not ineffective for failing to locate and interview victim because counsel's interviews with other witnesses and victim's efforts to elude counsel may have indicated that victim would not testify in defendant's favor].)

3. *Failure to Investigate Lawrence's Neighbor*

Tibbs also asserts Gass was ineffective for failing to search for, locate, and interview Lawrence's neighbor, who stated at the hearing that he did not see a gun or hear a gunshot. The discovery referee found Gass did not take steps to ascertain whether the neighbor would provide material exculpatory evidence, but Gass's performance was not deficient because Gass "had no reason to believe that any witnesses existed that would say that the incident did not involve a gun and a gunshot." Assuming Gass's performance was deficient, the referee found it was not reasonably probable Tibbs would have obtained a more favorable outcome but-for his counsel's performance.

Tibbs objects to the referee's findings concerning Gass's efforts to locate and interview Lawrence's neighbor. He argues Gass *did* have reason to believe one or more witnesses would testify that he did not fire a gun, since there was no physical evidence of a gunshot. He further emphasizes that Gass actually argued to the jury that no gun was fired, so Gass presumably had some reason to believe Tibbs did not fire a gun at Lawrence.[17]

We need not decide whether Gass's decision not to search for, locate, and interview the neighbor was deficient because, assuming Gass's conduct was unreasonable, Tibbs has not established that he was prejudiced by Gass's conduct. Preliminarily, it is far from clear Gass would have located the 16- or 17-year-old neighbor prior to trial if he had spent more time searching for percipient eyewitnesses, since the neighbor was arrested and booked in

---

[17]    At the evidentiary hearing, Gass testified that he did not remember Tibbs saying there was no gun, but Tibbs likely told him "there was no gun," or else he would not have made that argument to the jury.

juvenile hall on the night in question and, as far as we can discern, he was not identified as an eyewitness in any police reports that were provided to Gass. Indeed, Tibbs admits in his habeas petition that the neighbor's presence at the crime scene was "unknown," and the neighbor did not execute his declaration until *eight years* after trial—"shortly after he was discovered, located and interviewed" by Tibbs's habeas counsel. Further, Tibbs's habeas counsel executed a declaration in which he averred that he did not speak with the neighbor until September 21, 2017, and that it took "repeated efforts" to persuade him to sign his declaration.

Moreover, even if there was a reasonable probability Gass would have located the neighbor and persuaded him to testify at trial, we have adopted the discovery referee's well-supported finding that the neighbor's testimony concerning Tibbs's use of a gun was "not believable." As discussed, the neighbor's testimony conflicted in key ways with his own declaration and with the testimony of virtually every other witness who testified at trial or at the evidentiary hearing (namely, with regard to the number of participants and spectators from the incident); the neighbor claimed he did not remember important facts about the evening in question (like whether he was arrested at gunpoint while in possession of drugs); and the neighbor had a criminal history including a crime of moral turpitude.

Given the neighbor's lack of credibility, as well as the fact that several trial witnesses provided inculpatory testimony concerning Tibbs's use of a gun—including Lawrence, the investigating officers who interviewed both Lawrence and his girlfriend, and Tibbs's former friend—Tibbs has failed to establish a reasonable probability of a better outcome if Gass had searched for, located, and procured testimony from Lawrence's neighbor.

4. *Failure to Investigate Lawrence's Sister*

Finally, Tibbs argues Gass provided ineffective assistance of counsel by not investigating and procuring Lawrence's sister as a defense witness at trial. The People argue Gass did not act unreasonably because the police did not interview Lawrence's sister and Gass therefore had no reason to suspect she "had anything to say" about Tibbs's use of a gun.[18]

We need not decide whether Gass acted in a deficient manner because Tibbs has not established that he suffered prejudice from Gass's allegedly deficient performance. In findings we have already accepted, the discovery referee found Lawrence's sister was "simply not credible" when she testified about Tibbs' use of a gun. Her testimony conflicted in many key respects with representations she made in her declaration. Further, by her admission, she went inside during the fight between her boyfriend (Tibbs) and her brother (Lawrence)—a person who she once threatened to have beaten up and with whom she no longer speaks. For these reasons, Tibbs has not established that it is reasonably probable he would have obtained a more favorable result if Lawrence's sister had testified at trial.

---

[18] The People do not argue that Tibbs's ineffective assistance of counsel argument is procedurally barred insofar as it is based on Gass's failure to locate and procure Lawrence's sister as a defense witness. However, we note for the record that Tibbs made the same claim in his second petition for writ of habeas corpus. (*Tibbs II, supra*, D067841.) Our court issued an order to show cause, but denied relief in relevant part, "conclud[ing] it [was] not reasonably likely that Tibbs would have obtained a different result" at trial if Lawrence's sister had testified. (*Ibid*.) Tibbs directly appealed our decision to the Supreme Court (rather than filing an original petition for review in the Supreme Court), and review was denied. "It has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected." (*In re Clark* (1993) 5 Cal.4th 750, 767.)

## IV

## DISPOSITION

The petition for writ of habeas corpus is denied.

McCONNELL, P. J.

WE CONCUR:

DO, J.

BUCHANAN, J.